# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

LISA ANN VANHART,

     Plaintiff,

v.           ACTION NO. 2:12cv393

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

     Defendant.


# REPORT AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff brought this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. This Court recommends that Plaintiff's Motion for Summary Judgment be GRANTED, Defendant's Motion for Summary Judgment be DENIED, and the case be REMANDED.

---

[1] It is ORDERED that the style of the case shall be deemed amended to substitute as the sole respondent in this proceeding Carolyn W. Colvin, Acting Commissioner of Social Security.

# I.  PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on April 14, 2010, alleging mental and physical impairments that caused a disability starting on February 15, 2008. R.[2] 319-27. She stated her filing was due to a heart condition, stroke, slipped discs in her neck, arthritis in the spine, anxiety/panic attacks, restless leg syndrome, asthma, and memory problems. R. 319-27, 348, 354. The Commissioner denied Plaintiff's application at the initial level on September 27, 2010 and at the reconsideration level of administrative review on January 18, 2011. R. 201-22, 223-46.

At the administrative hearing held on May 11, 2009, Plaintiff was represented by counsel, and testified along with a vocational expert. R. 33-53.  Plaintiff amended her alleged onset date to August 11, 2009. R. 14, 35.  On February 10, 2012, the ALJ found Plaintiff was not disabled from August 11, 2009, through the date of the decision. R. 24. On May 2, 2012, the Appeals Council denied Plaintiff's request for administrative review of the ALJ's decision. R. 3-6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

# II.  FACTUAL BACKGROUND

A.      Plaintiff's Background

Plaintiff was born in May 1974 (R. 319), and was 37 years old on the date of the ALJ's decision.   Plaintiff has a ninth grade education (R. 355), and reported past work as a waitress. R. 356.  Plaintiff's date last insured is September 30, 2009. R. 349.   Therefore, Plaintiff must establish disability on or before that date in order to receive DIB.

---

[2] The citations in this Report and Recommendation are to the Administrative Record.

B.    Medical History

On July 16, 2007, Plaintiff was evaluated by medical providers at Eastern Shore Community Services for a clinical intake assessment. R. 69-74. On examination, they found that Plaintiff's motor activity was restless and her speech was slurred. R. 68.  They also found that Plaintiff's mood was angry, depressed, sad, irritable, labile, and anhedonic. R. 68.  They diagnosed Plaintiff as suffering from major depressive affective disorder, recurrent episode, moderate. R. 70.

On August 22, 2007, Nicholas McClean-Rice, M.D., performed a psychiatric evaluation of Plaintiff. R. 155-57.  On examination, Dr. McClean-Rice found that Plaintiff had a flat affect and "ha[d] been suicidal on and off in the last few months." R. 155.  Dr. McClean-Rice noted that Plaintiff's past medical history was "[s]ignificant for open heart surgery at [] 9 years [old]" and "[s]he still gets pain in the chest" and "cannot run because she gets short of breath." R. 155. He also noted that Plaintiff "had recurrent pneumonia and upper respiratory tract infection as a child." R. 155.   Dr. McClean-Rice diagnosed Plaintiff as suffering from personality disorder, not otherwise specified ("NOS"), and status-post cardiac surgery with shortness of breath. R. 156. He found she was depressed, suffered from insomnia, and had a global assessment of functioning "GAF" of 50.[3] R. 156.  He prescribed Celexa and Trazodone. R. 156.

On October 10, 2007, Plaintiff presented to Atlantic Community Health Center complaining of intermittent chest pain. R. 567. Caroline MacKellar, PA-C, a physician's assistant, diagnosed acute intrinsic asthma and unspecified chest pain.  R. 567.

The same day, Plaintiff treated with Dr. McClean-Rice. R. 827.  She was upset that her

---

[3]  A GAF of 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." *See* Diagnostic and Statistical Manual of Mental Disorders 34 (DSM-IV-TR) (4th ed., 2000).

husband had custody of their kids, but had started divorce procedures in hopes of regaining custody. R. 827.  She had stopped taking Celexa and had done well without it. R. 827.  Dr. McClean-Rice prescribed Trazodone. R. 827.

Plaintiff saw Dr. McClean-Rice on December 19, 2007. R. 826.  She completed a drug treatment program, was getting divorced from her husband, and was getting along well with her boyfriend. R. 826.  She was experiencing pain in her chest, which Dr. McClean-Rice opined was probably caused by her anxiety. R. 826.  He put her back on Celexa, but not Trazodone as she was sleeping well without it. R. 826.

On March 17, 2008, Plaintiff was treated at Peninsula Regional Medical Center for chest pain. R. 412-24.  On examination, Plaintiff was in "[m]ild respiratory distress" with "a dry cough." R. 413.  There was also "[b]ibasilar abnormalities . . . on the auscultation of [the] lungs with bilateral diminished breath sounds." R. 413.  A chest x-ray was performed, which revealed "a widened mediastinum, right paratracheal thickening, [and] some enlargement of the heart which is atypical for the patient's age of 33 years." R. 422.  The physician's impression was "some biventricular enlargement of the heart, pulmonary hypertension with enlargement of pulmonary arteries." R. 423.  Cory Carpenter, M.D., diagnosed atypical chest wall pain and asthma, and instructed Plaintiff to see her regular doctor if her pain did not resolve in one to two weeks. R. 418.

Lloyd J. Kellam, M.D., a cardiologist at Shore Memorial Hospital, examined Plaintiff on March 26, 2008. R. 587.  Dr. Kellam noted that Plaintiff had a prior ventricular septal defect repair at the age of 9 and had not had much follow-up care.  R . 587.  On examination, Plaintiff occasionally wheezed and coughed, but denied syncope, palpitations, or lightheadedness. R. 587.  She had a regular heart rhythm, no heart murmur, and decent peripheral pulses. R . 588.

Dr. Kellam performed an echocardiogram that did not reveal any abnormalities. R. 588. He diagnosed status post-ventricular septal defect repair, probable asthma, and tobacco abuse. R. 588. Dr. Kellam stated that he would be willing to examine Plaintiff again in a couple of years to make sure that her septal defect repair was intact. R. 588.

On May 11, 2008, Plaintiff was taken to Peninsula Regional Medical Center by emergency medical services for abdominal pain. R. 635-37. On examination, Plaintiff appeared to be in "mild distress" and her "abdomen [was] mildly tender in the right upper quadrant." R. 637, 638. Plaintiff was administered Morphine and Reglan intravenously. R. 638. Dr. Carpenter diagnosed Plaintiff with an ovarian cyst, prescribed Tylenol with Codeine, and discharged her on the same day. R. 640.

On June 24, 2008, a cardiopulmonary function test ("PFT") was performed, which revealed an "[a]bnormal study" as "[t]here [was] a moderately severe obstructive defect and a moderate restrictive defect." R. 433.

On August 7, 2008, consultative examiner, Richard Shea, Ph. D., performed a psychological evaluation of Plaintiff. R. 443-47. Plaintiff stated that she had anger problems, got upset easily, and experienced "screaming rages." R. 443. Plaintiff also stated that she "falls out" and does not remember these episodes. R. 443. She was previously in psychiatric treatment as a teen following sexual abuse, which led to suicidal behaviors. R. 444. She stated that she no longer was taking any psychiatric medications due to side effects. R. 444. Plaintiff reported her daily activities as going to a flea market and selling her wares, visiting with her three children every other weekend, and cooking and cleaning at her own pace. R. 444. Plaintiff also stated that she had a boyfriend and talked on the phone with friends. R. 444. She reported chest pain, breathing difficulties, sleep disturbance and nightmares. R. 444-45.

On examination, Plaintiff had adequate hygiene and grooming, coherent thoughts, adequate concentration, no perceptual abnormalities, and appeared calm. R. 445. Dr. Shea found that Plaintiff's "mood appear[ed] to be depressed" and "her affect was congruent with [her depressed mood]." R. 445. Dr. Shea also found "some evidence of suicide ideation, but [Plaintiff] denied any plan." R. 445. Dr. Shea found that Plaintiff "struggle[d] with mental calculations" and "her judgment and insight appear[ed] to be limited." R. 445. Dr. Shea diagnosed Plaintiff as suffering from depressive disorder, not otherwise specified; personality disorder, not otherwise specified; alcohol and cocaine dependence, in remission; and assessed her GAF score as 60. R. 446. He found that Plaintiff was capable of managing simple and repetitive tasks, and could accept instructions from supervisors and interact satisfactorily with coworkers and the general public. R. 446. Dr. Shea opined that Plaintiff's "substance abuse improvement and treatment as well as health issues would also affect her ability to work consistently." R. 446. Dr. Shea also opined that "in order to handle reasonable stress, [Plaintiff] need[ed] support for both the substance abuse and also to help deal with the health issues." R. 446.

On August 27, 2008, Dr. McClean-Rice, M.D., performed a second psychiatric evaluation, and noted that Plaintiff was polite, cooperative, and denied suicidal or homicidal ideation. R. 824. He also noted that Plaintiff was well-dressed, looked after her hair, and had a pretty smile. R. 824. She reported getting angry with her boyfriend, threatening to kill her boyfriend, and having nightmares. R. 824. Dr. McClean-Rice opines the anger issues are related to past abuse by her step-father. R. 824. He also notes that she has been in a substance abuse program for over one year, and is doing well. R. 824. Plaintiff stated she had gone off of her mental health medication, but that she wanted to go back onto the same medications (Celexa and Trazodone) because they were helping her condition. R. 825. Dr.

McClean-Rice diagnosed personality disorder not otherwise specified and found that Plaintiff had a GAF score of 60. R. 825.

On October 5, 2008, Plaintiff was brought by ambulance to Shore Memorial Hospital complaining of "lower quadrant abdominal pain" and "a squeezing sensation in her chest" with "some shortness of breath." R. 506. On examination, Plaintiff was comfortable and in no distress, however, "[t]here [were] expiratory wheezes in both lung fields." R . 506. Plaintiff's urinalysis revealed moderate bacteria, and a CT scan of her abdomen revealed an enlarged left ovary and an ovarian cyst. R. 507. Dan Dickerson, M.D., the attending physician diagnosed right lower quadrant abdominal pain of unclear etiology, possible urinary tract infection, chest squeezing of unclear etiology, and asthma. R. 507. He was concerned regarding the possibility of coronary artery disease given her smoking history. R. 507. He indicated that Plaintiff should "see a doctor in the next couple of days" for reevaluation as she presented to the hospital with "abdominal pain and tightness in her chest," and "was hypertensive at the time the ambulance brought her in, hypotensive after receiving nitroglycerin, and normotensive by the time she left." R. 475. Dr. Dickerson prescribed an antibiotic for Plaintiff's possible urinary tract infection, suggested that she take a multivitamin as she was mildly anemic, suggested she have repeat blood work done in 6-8 weeks, and released Plaintiff in stable condition. R. 507-08.

On October 20, 2008, Plaintiff underwent a cardiopulmonary stress test that revealed no evidence of chest pain, but did reveal a blunted heart rate response and exercise induced shortness of breath. R. 517.

On October 21, 2008, Plaintiff told Dr. McClean-Rice that she was getting along well with her boyfriend. R. 196. Dr. McClean-Rice continued Plaintiff on Celexa and Trazodone. R. 196. One month later, on November 18, 2008, Plaintiff again reported getting along well with her

boyfriend and Dr. McClean-Rice continued her same medications. R. 195.

On November 24, 2008, Plaintiff presented to Patricia Holbert, F.N.P., at Atlantic Community Health Center, with pain between the shoulder blades. R. 496-97. Nurse Holbert diagnosed Plaintiff as suffering from allergic asthma and back pain with radiculitis, and prescribed Flexeril, a muscle relaxant. R. 496-97.

On December 16, 2008, State agency psychologist, David Deaver, Ph. D., reviewed the record and completed a psychiatric review technique form. R. 450-63. Dr. Deaver found that Plaintiff had a depressive disorder NOS, personality disorder NOS, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. 461.

Dr. Deaver also completed a mental residual functional capacity ("RFC") assessment form. R. 464-466. Dr. Deaver opined that Plaintiff was moderately limited in the ability to (1) understand and remember detailed instructions, (2) carry out detailed instruction, (3) interact appropriately with the general public, and (4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes. R. 464-65. Dr. Deaver concluded that Plaintiff was able to meet the basic mental demands of simple, routine, competitive work on a sustained basis despite the limitations resulting from her impairments. R. 466.

Also on December 16, 2008, state agency medical consultant, Carolina Longa, M.D., reviewed the record and completed a physical RFC assessment form. R. 467-72. Dr. Longa found that Plaintiff retained the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and or walk about 6 hours during an 8-hour workday, and sit about 6 hours during an 8-hour workday. R . 468. She also found that Plaintiff could occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds. R. 469. Finally,

Dr. Longa determined that Plaintiff should avoid even moderate exposure to humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. R. 470. Dr. Longa noted, "[t]here are many contradictory statements regarding [Plaintiff's] pulmonary findings. I suggest [a] repeat chest x-ray and PFT [pulmonary function test] and DLCO [lung diffusion capacity test] before adjudication of this case." R. 472.

On January 15, 2009, Plaintiff informed Dr. McClean-Rice that she had been crying more and becoming irritable with her boyfriend. R. 194. She complained that Celexa was no longer working. R. 194. Dr. McClean-Rice prescribed Prozac in place of Celexa and continued to prescribe Trazodone. R. 194. One month later, Dr. McClean-Rice changed Plaintiff's medication back to Celexa because he felt that Prozac was making her more angry. R. 193.

On March 6, 2009, Plaintiff went to Atlantic Community Health Center due to high blood pressure, a knot on her left wrist, and indigestion. R . 492. Melissa Smith, a family nurse practitioner, diagnosed headache, dyspepsia, a ganglion cyst, and asthma. R. 493.

On March 11, 2009, Plaintiff reported to Dr. McClean-Rice that Celexa had worked to calm her down and she said that her behavior had improved. R . 192. Dr. McClean-Rice opined that she needs to be involved in therapy. R. 192.

On April 3, 2009, Plaintiff treated with Physician Assistant Caroline Mackellar for sore throat, body aches, fever/chills, cough, and tightness in the chest. R. 489-91. On examination, Physician Assistant Mackellar found that Plaintiff's appearance was "ill-appearing" and her mood and affect were anxious. R. 489. She also found "moderate labored breathing" and "expiratory wheezing in all lung fields." R. 489. She found that Plaintiff's "breathing bec[ame] notably more rapid and strained when [the practitioner was] in the room" and questioned whether this was caused by anxiety. R. 489. Physician Assistant Mackellar diagnosed Plaintiff with

asthma exacerbation, acute sore throat, myalgia, and acute bronchitis. R. 490.

On April 10, 2009, Plaintiff reported becoming increasingly angry with her boyfriend and said that her medications were not working. R. 190.  Dr. McClean-Rice noted that Plaintiff had been worrying about her 3-year-old daughter being in the custody of Plaintiff's estranged husband along with the two sons who were Plaintiff's and the estranged husband's biological children. R. 190.  Dr. McClean-Rice opined that based on Plaintiff's past sexual abuse by her stepfather, Plaintiff was "being reminded of the past in the present." R. 190.  Dr. McClean-Rice indicated that he would gradually switch Plaintiff from Celexa to Paxil. R. 190.

On May 18, 2009, Plaintiff informed Dr. McClean-Rice that she was doing "a lot better" on Paxil and was getting along "a lot better" with her boyfriend.  R. 808.

On August 11, 2009, Plaintiff went to Atlantic Community Health Center complaining of muscle soreness and stated that she thought she had a stroke the previous week.  R. 550.  Plaintiff reported that on August 7, 2009, her "left arm locked up real bad" and "[she] felt muscle pain in [the] posterior neck, [and her] chest felt 'tight.'" R. 550.   She had been taken by ambulance, and given nitroglycerin in route to the emergency room. R. 550.  Following a chest x-ray and evaluation, ER staff was unable to verify a stroke event.  R. 550.  Examination on August 11, 2009, revealed that Plaintiff's upper and lower extremity strength was "3/5 on the left" and Plaintiff was "unable to rotate left arm posteriorly." R. 551. Plaintiff "appear[ed] to have to concentrate on maneuvers of [the] left side . . .and often use[d] [her] right hand to guide limb to requested position"  and "walk[ed] slowly dragging [her] left foot." R. 551.  Physician Assistant MacKellar diagnosed Plaintiff as suffering from muscle weakness in the left arm and left leg and pain in the limbs. R. 551.  She prescribed Flexeril and referred Plaintiff to Robert M. Paschall, D.O., a neurologist, for evaluation. R. 551.

Plaintiff continued to seek monthly or bi-monthly treatment at Atlantic Community Health Center through May 2010, for various complaints including hot flashes, R. 548, vomiting, R. 546, headaches, R. 544, chest pain, asthma and restless leg syndrome, R. 541, bronchitis, R. 538, a rash, R. 536, a urinary tract infection, R. 533, and abdominal pain. R. 531. The medical professionals who treated Plaintiff prescribed medications for her symptoms and conditions. R. 533, 536, 539, 542, 545, 547.

On August 17, 2009, Plaintiff reported to Dr. McClean-Rice that "she might have had a stroke" and "[i]t has affected the left side of her body [as] she is weak in the left arm and left leg." R. 153. Dr. McClean-Rice found that Plaintiff had "bruises on the right arm and right thigh" and "walk[ed] with a limp." R. 153. Dr. McClean-Rice noted that Plaintiff "has had pain in the head as well as episodes of falling over." R. 153. Plaintiff asked if she could increase her dose of Paxil, but Dr. McClean-Rice told Plaintiff to just spread out her current dose. R . 153.

On October 6, 2009, Dr. McClean-Rice found that Plaintiff "[d[id] not look well physically" and was "off color." R. 152. He continued Plaintiff's Paxil and Trazdone at the same dosage levels. R. 152. He noted that Plaintiff "may have to go see her family doctor." R. 152.

On December 23, 2009, Plaintiff treated with Dr. Paschall for left side weakness. R. 528-30. On examination, Dr. Paschall found that Plaintiff's "[r]eflexes [were] hyperreflexia on the left side." R. 529. Dr. Paschall also found that Plaintiff had a "[l]eft spastic hemiparetic gait," "mild left hemiparesis, pronation drift, curling, left-sided weakness, left hyperflexia, and decreased arm swing on the left." R. 529-30. Dr. Paschall diagnosed Plaintiff as suffering from late effects of CVA (cerebrovascular accident or stroke) and depression, and ordered an echocardiogram and an MRI. R. 530.

On December 29, 2009, Dr. McClean-Rice noted that Plaintiff was much calmer, that she

had not been getting angry with her boyfriend, that she had been off of Paxil for one month, and that she was doing fine without the medication. R. 151. Therefore, Dr. McClean-Rice only prescribed Trazodone. R. 151.

On February 9, 2010, Plaintiff reported to Physician Assistant Caroline W. Mackellar that she "experienced precordial chest pain [the day before], lasting 3-5 minutes per episode, occurring at rest and with exertion," and she "simultaneously experience[d] pain in her neck radiating down her left arm, described as [a] sharp quick pain." R. 700. On examination, Plaintiff was mildly anxious, and had "residual subtle slurring secondary to CVA 09/09." R. 700. Physician Assistant Mackellar diagnosed Plaintiff as suffering from chest pain, NOS and CVA, and prescribed Plavix among other medications. R. 701.

On February 12, 2010, Dr. Paschall noted that Plaintiff's MRI study and a CT scan study of her brain were normal. R. 526. He noted that he could not find anything on her MRI study that explained the etiology of her left-sided weakness. R. 526. On examination, Dr. Paschall found that Plaintiff had "a left Babinski sign" and "clumsiness and disuse of her left hand." R. 526. Dr. Paschall also found that Plaintiff "seem[ed] mildly dysarthric and had a slight left facial." R. 526. He recommended that Plaintiff undergo an MRI study of her cervical spine to rule out a lesion on her spinal cord. R. 526.

On February 18, 2010, an MRI of Plaintiff's cervical spine was performed, which revealed "localized disc disease and stenosis." R. 504.

On March 18, 2010, a stress test was performed. R. 515. However, the stress test was stopped secondary to Plaintiff's fatigue. R. 515. Notes indicate there was no ischemia at the level achieved, but a blunted heart rate response and somewhat blunted blood pressure response. R. 515. The notes further indicate that Plaintiff gave a "fair effort." R. 515.

On March 23, 2010, Plaintiff treated with Physician Assistant MacKellar for acute asthma exacerbation. R. 538-40. Examination revealed that Plaintiff's mood and affect were mildly anxious and her speech had "residual subtle slurring secondary to CVA [in] 08/09." R. 538. Physician Assistant MacKellar also found "prolonged expiratory wheezing in all lung fields" and "decreased air movement." R. 538. She diagnosed Plaintiff as suffering from asthma NOS exacerbated, and bronchitis NOS. R. 538.

On March 29, 2010, Plaintiff reported to Dr. McClean-Rice that "she had three strokes since [Dr. McClean-Rice] last saw her." R. 150. Plaintiff also reported that she had "a slipped disc in her neck and arthritis of the spine," that her arms and neck hurt, that she had weakness in her left hand, and that she had memory loss. R. 150. Dr. McClean-Rice found she was more anxious than depressed. R. 150. He indicated that he "would like to put [Plaintiff] back on an SSRI [selective serotonin re-uptake inhibitor] drug" and that Celexa interacts with few drugs." R. 150. He prescribed Celexa and also continued Trazodone. R. 150.

On April 17, 2010, an x-ray examination of Plaintiff's chest was negative. R. 601.

On April 20, 2010, Dr. Paschall explained to Plaintiff that her cervical spine MRI study revealed no evidence of a surgical lesion. R. 521. An examination revealed that her gait was now normal, but her "[r]eflexes [were] hyperreflexia on the left side." R. 523-24. Dr. Paschall diagnosed Plaintiff as suffering from depression, NOS and late effects of CVA, unspecified. R. 523. Dr. Paschall prescribed Paxil. R. 523. He also noted, "If [Plaintiff] has further attacks, we would add a benzodiazepine because I think this is a panic disorder." R. 524.

On May 4, 2010, Plaintiff reported to Dr. McClean-Rice that "[s]he drops things with her left hand and has had a stroke on the left side of the brain on three occasions." R. 149. Plaintiff also reported that "her memory is much worse since she had the stroke." R. 149. Dr. McClean-

13

Rice noted that he spoke with Plaintiff's neurologist, Dr. Paschall, who "said he had ruled out a hyper coagulability state, he had ruled out by echocardiogram that [Plaintiff] is not embolizing after the ventricular septal defect repair she had as an infant . . . there is no shunting apparently there either [,]" and "he [did] not know what was causing her stroke." R. 149.  Dr. Paschall also indicated to Dr. McClean-Rice that "he has been worried about [Plaintiff], especially having these problems at her young age." R. 149.  Dr. McClean-Rice questioned whether "a repeat ultrasound of the heart" and "a cardiology consult across the bay might be helpful." R. 149. Plaintiff stated that she had been diagnosed as having panic attacks and, as a result, had been prescribed Paxil.  R. 149.  However, she said that she did not take it because she was doing well off medication.  R . 149.  Dr. McClean-Rice did not prescribe any medications.  R . 149.

On June 17, 2010, Dr. McClean-Rice noted that Plaintiff "want[ed] to see a new specialist, but has no insurance." R. 148.  Dr. McClean-Rice indicated that he and Plaintiff's case manager were trying to "get some information on the appropriate physicians [at Norfolk hospital] for a young woman with undiagnosed embolic phenomena and three known episodes of stroke." R. 148.  Plaintiff informed Dr. McClean-Rice that she was no longer taking Celexa and only wanted to continue taking Trazodone.  R. 148.

On July 22, 2010, medical providers at Eastern Shore Community Services completed an annual update assessment. R. 74-76.  They found that Plaintiff continued to require "case management services to help her manage her skills of daily living, supportive relationships with others, as well as emotional coping skills." R. 75. In addition, they found that Plaintiff need[ed] "[m]onitoring of her medical care/medical management." R. 75.

On August 30, 2010, Plaintiff presented to Atlantic Community Health Center for severe right-sided abdominal pain and vomiting.  R. 689.  David Hoshino, M.D., instructed Plaintiff to

seek emergency treatment at Shore Memorial Hospital.  R. 690.

On September 10, 2010, Patricia Staeher, M.D., a state agency physician reviewed the evidence of record at the initial level of administrative review and found that Plaintiff needed to avoid concentrated exposure to temperature extremes, humidity, and environmental pollutants. R. 206-07, 216-17. Dr. Staher found Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, walk 6 hours in an 8-hour day, and sit 6 hours in an 8-hour day. R. 207-208.

On September 27, 2010, Kim Zweifler, Ph.D., a state agency psychologist, also reviewed the evidence of record at the initial level and found that Plaintiff did not have a severe mental impairment.  R. 205, 215.

On October 4, 2010, Plaintiff presented to Physician Assistant MacKellar with back pain. R. 687-88.  Notes indicate Plaintiff "was recently admitted for 2 days to RSMH for ruptured ovarian cyst right side, excessive bleeding internally due to Plavix, blood transfusion done in place of surgery." R. 687.  On examination, Plaintiff had normal range of motion in her upper extremities and negative straight-leg raising, but "was moderately tender to palpation at L4." R. 687.  Physician Assistant MacKellar diagnosed Plaintiff as suffering from back pain, secondary to arthritis for which she prescribed Tramadol, and a ganglion cyst on left wrist for which she prescribed a topical cream. R. 688.

Dr. Kellam examined Plaintiff again on October 12, 2010, due to her complaints of chest pain.  R. 652.  He noted that Plaintiff's chest pain was more of a constant aching that was worse when she thought about it, was not related to effort, and bothered her less when she cleaned her house or walked. R. 652.  Dr. Kellam also noted that Plaintiff had shortness of breath, coughing, and wheezing due to heavy smoking.  R . 652.  His diagnostic impression was of chronic chest

pain that was not likely cardiac, and he recommended that Plaintiff undergo a nuclear stress test. R. 653. Dr. Kellam stated that if Plaintiff's stress test was normal, Plaintiff's chest pain could be "put to rest." R. 653. He concluded that it was "highly likely" that Plaintiff's chest pain was not organic. R. 653.

On October 25, 2010, Plaintiff underwent a Cardiolite stress test that was "unremarkable." R. 651.

Physician Assistant MacKellar treated Plaintiff for asthma and bronchitis on December 21, 2010 (R. 683-84), bronchitis on January 28, 2011 (R. 681-82), bladder inflammation and a urinary tract infection on April 4, 2011 (R. 679-80), and seasonal allergies on April 25, 2011 (R. 676-77).

On January 5, 2011, Plaintiff reported to Dr. McClean-Rice that "[s]he pulled a butcher's knife on her boyfriend" and "[t]he cops were called three times on that occasion." R. 765. She explained that she had directed intermittent explosive episodes towards her boyfriend and did not know why. R. 765. Dr. McClean-Rice once again prescribed Celexa for Plaintiff to help her calm down. R. 765. He noted that both of her legs were shaking and that it was obvious Plaintiff was shocked by her own behavior and that she had not acted this way in a long time. R. 765. Plaintiff also reported that she had intermittent chest pain for which she was prescribed Nitroglycerin, but "it still takes up to an hour to relieve it." R. 765. Dr. McClean-Rice noted she should consider therapy to talk about her stepfather's abuse. R. 765.

On January 13, 2011, at the reconsideration level of administrative review, Dr. Longa found that Plaintiff retained the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours during an 8-hour workday, and sit about 6 hours during an 8-hour workday. R. 229, 240. Dr. Longa also found that

Plaintiff could occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, and crouch; and had a limited ability to perform overhead reaching with both arms and a limited ability to perform fine manipulations with her left hand. R. 229-30, 240-41. Finally, Dr. Longa found that Plaintiff needed to avoid concentrated exposure to temperature extremes, humidity, and hazards and moderate exposure to environmental pollutants. R . 230-31, 241-42.

On January 18, 2011, Stonsa N. Insinna, Ph.D., a state agency psychologist, found that Plaintiff did not have a severe mental impairment. R. 227-28, 238-39.

On June 9, 2011, Plaintiff presented to Physician Assistant MacKellar with "symptoms of left foot deviating laterally [for the past four days]." R. 674. Plaintiff stated that she had experienced a mini stroke because she could not bring in her left foot due to pain radiating from her left hip down to her left foot. R . 674. Plaintiff reported that the left leg "hurts, especially if you rub[ed] it or tr[ied] to move it back in place." R. 674. Physician Assistant MacKellar found that range of motion of the left hip was "very limited due to [Plaintiff] guarding to avoid hip pain" and her "strength against resistance [was] 3/5 on the left." R. 674. She diagnosed Plaintiff as suffering from hip pain, prescribed Carisoprodol, recommended that Plaintiff undergo an x-ray examination of her left hip, and referred Plaintiff to Dr. Paschall. R. 674-75.

On August 8, 2011, Jeanne R. Roll, M.D., examined Plaintiff for her complaints of pain in her thoracic spine. R . 672. Plaintiff stated that while she was at a carnival, she was "riding all the nasty spinning things and bracing herself against the forces." R. 672. Dr. Roll noted that while Plaintiff reported pain virtually everywhere that Dr. Roll touched, Plaintiff had normal spinal range of motion. R. 672. Dr. Roll diagnosed thoracic spine strain and prescribed a muscle relaxant. R. 672.

Progress Notes from the Eastern Shore Community Services Board for September and October 2011 consistently indicate under "Goals" that Plaintiff "will need ongoing adequate medical and psychiatric contacts and care for the thought disorder and problems caused by her stroke." R. 831-47. One note from September 13, 2011 indicates Plaintiff was discharged from therapy due to noncompliance. R. 844. However, several Progress Notes indicate discussions over the phone and in the clinic later in September and October 2011. R. 831-43.

On September 21, 2011, Plaintiff reported to Dr. McClean-Rice that she still "gets chest pain [] and takes Nitroglycerine which usually works but not always." R. 840. Dr. McClean-Rice opined that Plaintiff "has not been approved for disability and she certainly needs to get it and is entitled to it. In addition to symptoms of panic she has chest pains that are disabling and very frightening [] and post-traumatic stress disorder." R. 840. He noted that Plaintiff takes Buspar, Trazodone, Clonidine, and Plavix "because she has had several strokes and is a very young woman for this to have occurred." R. 841. He also noted that Plaintiff had "flashbacks of the past of being abused," and "gets panic attacks when she goes out." R. 841.

On September 24, 2011, Dr. McClean-Rice increased Plaintiff's dose of Prozac, which he had prescribed for Plaintiff five weeks earlier. R. 841.

C.    ALJ Hearing – January 9, 2012

At the ALJ hearing, Plaintiff testified that she could not work due to chest pain, back pain, neck pain, asthma, shortness of breath, and anxiety. R. 37. She stated that her pain medication only offered her a little bit of relief. R. 39.

Plaintiff stated that she is on a breathing machine and asthma pumps, and has to sit down every five minutes due to shortness of breath. R. 39. She stated that she quit smoking two months prior to the hearing. R. 39.

Plaintiff testified she gets nervous around people, and that she can only walk one block before her asthma acts up and she gets chest pains. R. 39-40. She stated she could sit 20 or 30 minutes before needing to lie down, and she could lift between 5-10 pounds. R. 40. She stated she has numbness on the left side. R. 41. Plaintiff stated that her fiancé performed most of the cooking and cleaning and that they both shopped for groceries. R. 42. She does not drive. R. 42. Plaintiff testified that she does not do much during the day other than play games on the computer, watch television, lie down, and go for rides to the store. R. 44. She testified that her medication makes her sleepy, and that she started having trouble with her memory around the time she started having strokes. R. 44-45.

Next, the ALJ asked the vocational expert to consider a hypothetical individual of Plaintiff's age and education, with no past relevant work experience. R. 47. The ALJ stated that this individual could perform light work, but only occasionally climb stairs, reach with the left upper extremity above shoulder level, or perform fine manipulations with the left hand. R. 47. The ALJ stated that the individual should not be exposed to extreme cold, extreme heat, humidity, pulmonary irritants, or hazards like moving machinery or unprotected heights. R. 47. The individual would also be limited to simple, routine, repetitive tasks involving short, simple instructions in an environment with few changes; no public contact; and only brief, infrequent contact with supervisors and co-workers. R. 47.

The vocational expert testified that such an individual could perform work as an inspector (250 jobs locally/400,000 jobs national), mail clerk (400 jobs locally/90,000 jobs nationally), and night watchman/unarmed security guard (750 jobs locally/500,000 jobs nationally). R. 48-49. While the vocational expert originally testified that the hypothetical individual could perform

work as a cashier, she later explained that such a position was not available due to the requirement of no public contact. R. 48-49.

The ALJ then asked the vocational expert to consider a hypothetical individual with the same restrictions, except that the exertional capacity would be reduced from light work to sedentary work. R. 50. The vocational expert testified that such an individual could perform work as a security alarm monitor (300 jobs locally/90,000 jobs nationally), sedentary inspector (200 jobs locally/150,000 jobs nationally), and machine tender (200 jobs locally/100,000 jobs nationally). R. 50-51. The vocational expert further testified that if the hypothetical individual were either unable to focus for two hours at a time, or were absent more than one day a month, or needed to take unscheduled breaks, then none of these jobs would be available. R. 51.

D.      ALJ's Decision – February 12, 2012

The ALJ first found that Plaintiff met the insured status requirement through September 30, 2009. R. 16. Second, he concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, August 11, 2009. R. 16. Third, the ALJ found that Plaintiff has a number of severe impairments including: panic disorder, dysthymia, asthma, degenerative disc disease of the cervical spine, and history of cerebrovascular accidents. R. 16. The ALJ found that the other conditions, including a history of ventricular septal defect repaired at age 9, and chest pain, were non-severe as they caused no significant functional restrictions. R. 17.

The ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart 4, Appendix 1." R. 17. In making this finding, the ALJ explained that Plaintiff's somatoform disorders resulting in pseudo-stroke, left-sided weakness, and memory problems did not meet the requirements of the Administration's guidelines. R. 17. The ALJ found that these

conditions result in only a mild restriction on Plaintiff's daily life, and a moderate restriction on social functioning, concentration and persistence or pace. R. 17-18.

Further, after looking at the record, the ALJ concluded that Plaintiff had the residual functional capacity (RFC) to perform light work "except she can only occasionally climb stairs, perform overhead reaching, and perform fine manipulations with the left (non-dominant) upper extremity; she cannot climb ladders or be exposed to moving machinery, unprotected heights, extreme cold or heat, humidity, or pulmonary irritants like gas, dust, fumes, odors; she is limited to simple, routine, repetitive tasks involving short, simple instructions in an environment with few workplace changes, no public contact, and only brief, infrequent contact with supervisors and co-workers." R. 18. In making this finding, the ALJ summarized treatment records addressing Plaintiff's panic disorder and dysthymia, asthma, degenerative disc disease, and history of CVAs. R. 19-22. The ALJ concluded Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are "not credible to the extent they are inconsistent with the record as a whole." R. 22.

The ALJ explains that, "[a]s for opinion evidence, the undersigned gives great weight to the opinion of the State agency medical consultant dated January 12, 2010, as it is consistent with the record as a whole." R. 22. Lastly, the ALJ makes the following findings with respect to Dr. McClean-Rice,

> Nicolas McClean-Rice, M.D., [Plaintiff's] psychiatrist, opines throughout the treatment record that [Plaintiff] is entitled to disability (Exhibits 27F and 28F). However, opinions as to whether or not a claimant is disabled are reserved for the Commissioner (20 CFR 404.1527; SSR 96-5p). More importantly, Dr. McClean-Rice seems to base his opinion on the claimant's physical status. He repeatedly says she had three strokes, slipped discs, arthritis of the spine, chest pain, etc. However, these physical impairments have been accounted for in the residual functional capacity. Further, according to Dr. McClean-Rice's

21

> records, [Plaintiff] is doing better on medication despite a lot of
> drama in her life. The psychosocial stressors also seem to
> influence his opinion of disability (Exhibit 28F/11). Therefore, the
> undersigned affords Dr. McClean-Rice' s opinion little weight.

R. 23.

The ALJ found that Plaintiff has no past relevant work, that she was 33 years old (a younger individual) at the alleged onset date, has a limited education and is able to communicate in English. R. 23. Based on these findings, the ALJ concluded that there were a significant number of jobs that Plaintiff could do in the current economy, and that Plaintiff has not been under a disability as defined by the Social Security Act from August 11, 2009 through February 10, 2012, the date of the decision. R. 23-24.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act. In addition, to qualify for DIB, and individual must meet the insured status requirements of the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether

the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

Plaintiff asserts that (1) the ALJ committed harmful error by failing to properly develop the record, (2) the ALJ's RFC finding is unsupported by substantial evidence and is the product of legal error, (3) the ALJ failed to apply the appropriate legal standards in assessing Plaintiff's credibility, and (4) the ALJ's Step 5 determination is unsupported by substantial evidence and is the product of legal error. Pl.'s Mem. 15-23; ECF No. 14. The Court agrees with Plaintiff that there is not substantial evidence in the record to support the ALJ's findings.

A.     The ALJ's Decision is Not Supported by Substantial Evidence

Plaintiff asserts the ALJ erred by failing to (1) request treating source opinions of limitations and diagnostic reports from Plaintiff's treating physicians Dr. McClean-Rice and Dr. Paschall; (2) request a repeat chest x-ray, PFT, and DLCO as suggested by state agency consultant Dr. Longa; and (3) weigh the opinions of the consultative examiner and state agency consultants. Pl.'s Mem. 15, 18. Defendant counters that (1) the ALJ has no duty to develop the record where Plaintiff is represented, (2) the lack of medical source statements does not make the record incomplete, (3) medical source statements were not necessary for the ALJ to reach his determination in this case, (4) additional pulmonary tests were not necessary as the ALJ

accounted for Plaintiff's pulmonary deficiencies in his RFC, and (5) the ALJ reasonably weighed the evidence when assessing Plaintiff's RFC. Def.'s Mem. 17-20; ECF No. 16.

Although Plaintiff has the burden of proving disability, *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987), "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986), *citing Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). Contrary to Defendant's assertion, the ALJ retains this duty to develop the record when a plaintiff is represented. *See Sims v. Apfel*, 530 U.S. 103, 111 (2000) (discussing the ALJ's duty to "investigate the facts and develop the arguments both for and against granting benefits"); *Cook*, 783 F.2d at 1173 (discussing ALJ's duty to develop the record); *Bosley v. Astrue*, 2012 WL 3730673, * 24 (N.D. W.Va. July 27, 2012) (holding ALJ has duty to develop record even if a plaintiff is represented); *Sandy v. Astrue*, 2009 WL 2006882, *15 (N.D. W.Va. July 9, 2009) (same). The ALJ is responsible for creating a complete medical record before making a disability determination. *See* 20 C.F.R. §§ 404.1512(d)(-(f), 416.927(d)-(f) (2012). The ALJ can develop the record by questioning witnesses, requesting evidence, and subpoenaing witnesses. 20 C.F.R. §§ 404.944, 404.950(d) (2012). Remand is necessary when the ALJ fails to "fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant." *Marsh*, 632 F.2d at 300; *Gee v. Astrue*, 2011 WL 3472632, *5 (E.D. Va. July 21, 2011). "'Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.'" *Huddleston v. Astrue*, 826 F. Supp. 2d 942, 958 (S.D. W. Va. 2011), *citing Ripley v. Chater*, 67 F.3d 552, 557 n. 22 (5th Cir. 1995).

The ALJ failed to adequately develop the record in this case where the 847 page administrative record contains no medical source statements from Plaintiff's treating doctors, Dr. McClean-Rice and Dr. Paschall. The code sections discussing "medical and other evidence of your impairments," 20 C.F.R. §§ 404.1513 and 416.913, state that medical reports from acceptable medical sources should include: medical history, clinical findings, laboratory findings, diagnosis, treatment prescribed with response and prognosis, and "a statement about what you can still do despite your impairment(s) based on the acceptable medical source's findings" under the factors just listed. 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) (2012). The section further states, "[a]lthough we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete." *Id.*

Neither party has indicated whether medical source statements were ever requested from Dr. McClean-Rice or Dr. Paschall. However, the fact that the record is lacking such opinion evidence is repeatedly noted by the state agency consultants reviewing the record, as discussed below in section IV.A.4. Although the lack of medical source statements will not necessarily make the report incomplete, the lack of opinion evidence from Plaintiff's treating sources coupled with the ALJ's failure to address the consultative examiner's opinion or the opinions of five of the six state agency consultants precludes the Court from finding substantial evidence to support the ALJ's opinion.

1.    Dr. McClean-Rice – Plaintiff's Psychiatrist

Plaintiff was under the treatment of Dr. McClean-Rice with Eastern Shore Community Services Board Behavioral Health Services from August 2007 through September 2011. R. 148-57, 159, 190-96, 765, 808, 824-30, 840-41. Dr. McClean-Rice treated Plaintiff for personality

disorder not otherwise specified, depression, insomnia, anxiety, and post-traumatic stress disorder. *Id.* Over the course of this treatment Dr. McClean-Rice recommended therapy, and prescribed Celaxa, Trazadone, Prozac, and Paxil. *Id.* The record contains progress notes from over twenty visits to Dr. McClean-Rice *Id.* In addition, there are countless progress notes and other records from Plaintiff's counselors and case managers at the Eastern Shore Community Services Board. R. 63-147, 158, 160-89, 199-200, 730-64, 766-75, 777, 779-80, 782-87, 789-93, 795-98, 800-806, 813-15, 817-23, 831-39, 842-47.[4]

Although this wealth of reports exist, there is no medical source statement from Dr. McClean-Rice explaining what Plaintiff can do despite her impairments based on her medical history, clinical findings, laboratory findings, diagnosis, and treatment prescribed with response and prognosis, as contemplated by 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) (2012). However, the ALJ notes that "Nicolas McClean-Rice, M.D., [Plaintiff's] psychiatrist, opines throughout the treatment record that [Plaintiff] is entitled to disability." R. 23. The ALJ assigns this opinion "little weight." R. 23. In addition to noting that the ultimate decision regarding disability is reserved for the Commissioner, the ALJ states "Dr. McClean-Rice *seems* to base his opinion on the claimant's physical status" and "[t]he psychosocial stressors also *seem* to influence his opinion of disability." R. 23 (emphasis added). It is clear from the way the ALJ phrased his findings that he does not know the basis of Dr. McClean-Rice's opinion. The ALJ should have contacted Dr. McClean-Rice for clarification of the basis for his opinion. *See* Social Security Ruling 96-5p ("For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us."). With no

---

[4] The Court notes that several of the Eastern Shore Community Services Board documents, including documents from Dr. McClean-Rice, are found in more than one location in this administrative record.

medical source statement in the record, neither the ALJ nor the Court can determine Dr. McClean-Rice's opinion regarding what Plaintiff can still do despite her mental impairments and why he considered Plaintiff to be disabled.

### 2. Dr. Richard Shea – Consultative Examiner

The only opinion in the record regarding what Plaintiff can still do despite her mental impairments is the opinion of consultative examiner, Richard Shea, Ph. D. On August 7, 2008, Dr. Shea performed a psychological evaluation of Plaintiff. R. 443-47. Dr. Shea diagnosed Plaintiff as suffering from depressive disorder, not otherwise specified; personality disorder, not otherwise specified; alcohol and cocaine dependence, in remission; and assessed her GAF score as 60. R. 446. He found that Plaintiff was capable of managing simple and repetitive tasks, and could accept instructions from supervisors and interact satisfactorily with coworkers and the general public. R. 446. Dr. Shea opined that Plaintiff's "substance abuse improvement and treatment as well as health issues would also affect her ability to work consistently," and "in order to handle reasonable stress, [Plaintiff] need[ed] support for both the substance abuse and also to help deal with the health issues." R. 446. The ALJ fails to discuss Dr. Shea's psychological evaluation or findings in his decision, much less assign Dr. Shea's opinion weight.

Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 416.927(e)(2)(ii) (2012). This is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the records as a whole to determine whether

the conclusions reached are rational.'

*Arnold v. Secretary of Health, Ed. and Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).  By failing to discuss and assign weight to Dr. Shea's findings, the ALJ has committed an error of law.

### 3.  Dr. Paschall – Plaintiff's Neurologist

Plaintiff was treated by Robert M. Paschall, D.O., a neurologist from December 2009 through April 2010. R. 521-30.  Examination in December 2009 revealed Plaintiff had a "[l]eft spastic hemiparetic gait,"  "mild left hemiparesis, pronation drift, curling, left-sided weakness, left hyperflexia, and decreased arm swing on the left." R. 529-30.  In February 2010, examination revealed "a left Babinski sign" and "clumsiness and disuse of her left hand." R. 526.  Dr. Paschall also found that Plaintiff "seem[ed] mildly dysarthric and had a slight left facial." R. 526.  In April 2010, Plaintiff's gait was normal, but her "[r]eflexes [were] hyperreflexia on the left side." R. 523-24.  Dr. Paschall diagnosed Plaintiff as suffering from depression, NOS and late effects of CVA, unspecified, and he prescribed Paxil. R. 523.  He also noted, "If [Plaintiff] has further attacks, we would add a benzodiazepine because I think this is a panic disorder." R. 524.  The ALJ discusses Dr. Paschall's treatment in his decision. R. 20-22.  However, there is no medical source statement from Dr. Paschall explaining what Plaintiff can do despite her impairments for the state agency consultants to consider when making their determinations, or the ALJ to weigh in reaching his decision.

### 4.  State Agency Consultants

On December 16, 2008, State agency psychologist, David Deaver, Ph. D., reviewed the record and completed a psychiatric review technique form, finding Plaintiff had a depressive disorder NOS, personality disorder NOS, moderate difficulties in maintaining social functioning,

and moderate difficulties in maintaining concentration, persistence, or pace. R. 450-63. Dr. Deaver also completed a mental RFC assessment form concluding Plaintiff was able to meet the basic mental demands of simple, routine, competitive work on a sustained basis despite the limitations resulting from her impairments. R. 464-66.

Also on December 16, 2008, state agency medical consultant, Carolina Longa, M.D., reviewed the record and completed a physical RFC assessment form. R. 467-72. Dr. Longa found that Plaintiff retained the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and or walk about 6 hours during an 8-hour workday, and sit about 6 hours during an 8-hour workday. R . 468. Dr. Longa determined that Plaintiff should avoid even moderate exposure to humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. R. 470. Dr. Longa checked a box to indicate "No" in answer to the question "Is treating or examining source statement(s) regarding [Plaintiff's] physical capacities in file?" R. 471. Dr. Longa concluded "[t]here are many contradictory statements regarding [Plaintiff's] pulmonary findings. I suggest [a] repeat chest x-ray and PFT [pulmonary function test] and DLCO [lung diffusion capacity test] before adjudication of this case." R. 472.

Chest x-rays performed on August 11, 2009, and April 17, 2010 were both negative. R. 550, 601. The record does not reflect, however, any repeat PFT or DLCO.

On September 27, 2010, Patricia Staehr, M.D., a state agency physician, and Kim Zweifler, Ph.D., a state agency psychologist, reviewed the record and determined Plaintiff was not disabled. R. 201-10. Under the heading "Weighing of Opinion Evidence," both doctors indicate, "[t]here is no indication of medical or other opinion evidence in file." R. 206, 216. Similarly, under the section entitled "Reconciling of Source Opinion," they note, "[t]his section has been considered but does not apply to this claim." R. 209, 219.

The same two statements regarding no opinion evidence and no reconciling of source opinions appears in January 2011 when Dr. Longa, and Stonsa N. Insinna, Ph.D., LCP, a state agency psychologist, reviewed the record and determined Plaintiff was not disabled at the reconsideration level of review. R. 229, 231, 240, 243.

     i.      <u>ALJ Only Assigns Weight to 1 of the 6 State Agency Consultant Opinions</u>

Without reference to the other five state agency opinions, the ALJ "gives great weight to the opinion of the State agency medical consultant dated January 12, 2010, as it is consistent with the record as a whole (Exhibit 5A)." R. 22. Presumably, the ALJ is referring to the "Disability Determination Explanation" reached at the reconsideration level of review and signed by Dr. Longa on January 13, 2011, as that is the exhibit referenced. R. 223-33. In that determination, Dr. Longa found that Plaintiff retained the ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours during an 8-hour workday, and sit about 6 hours during an 8-hour workday. R . 229. Dr. Longa found Plaintiff limited in her ability to climb ramps, stairs, ladders, ropes, and scaffolds, to perform overhead reaching with both arms, and to perform fine manipulations with her left hand. R. 229-30. Finally, Dr. Longa found that Plaintiff needed to avoid concentrated exposure to temperature extremes, humidity, and hazards and moderate exposure to environmental pollutants. R . 230-31. In reaching this determination, Dr. Longa noted there was no opinion evidence in the file, therefore, no need to reconcile source opinion. R. 229, 231. The ALJ erred in failing to assign weight or even mention the other five state agency consultant opinions, one of which is Dr. Longa's from a previous review of the record. *See Arnold*, 567 F.2d at 259; 20 C.F.R. § 416.927(e)(2)(ii) (2012).

ii. ALJ Fails to Obtain Additional Pulmonary Testing

The ALJ's failure to discuss the additional state agency opinions is the foundation for Plaintiff's argument that the ALJ failed to develop the record by not obtaining the additional pulmonary testing suggested by Dr. Longa following her first review of the record. Pl.'s Mem. 18. Defendant asserts the ALJ did not err by not requiring the additional tests suggested by Dr. Longa, because the ALJ accounted for any limitations Plaintiff might have had as a result of her pulmonary impairment by limiting her to work that did not involve any exposure to extreme heat or cold, humidity, or pulmonary irritants like gas, dust, fumes and odors. Def.'s Mem. 19-20. The Court finds this argument unpersuasive, as Dr. Longa included those same restrictions in her RFC, but nevertheless felt additional testing was needed. R. 470-72. If the restrictions were sufficient to address any pulmonary impairment the tests might reveal, it would have been unnecessary to suggest that the ALJ obtain the tests prior to making a disability determination. This Court cannot speculate as to why two of the additional tests were never ordered, or were not necessary to the ALJ's decision, since the ALJ fails to discuss that Dr. Longa ever suggested they should be obtained prior to reaching a disability determination.

Failing to develop a full record precludes the Court from engaging in a meaningful review of the ALJ's decision because it cannot speculate as to how the ALJ's decision might have been different had the necessary records been obtained, and had he correctly assessed the evidence before him. *See Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (remanding case where no fact finder had made any findings concerning the weight of a treating physician's opinion); *Hays*, 907 F.2d at 1456 ("[I]t is not within the province of a reviewing court to determine the weight of the evidence . . . ."); *Cook*, 783 F.2d at 1174 (remanding where ALJ's "insufficient development of the evidence" made it "impossible to conclude that there [was]

32

substantial evidence to support" the finding of no disability). The ALJ erred in (1) failing to obtain medical source statements from Dr. McClean-Rice and Dr. Paschall; (2) assigning little weight to Dr. McClean-Rice's opinion that Plaintiff was disabled without clarifying the basis for that opinion, (3) failing to discuss or assign weight to the evaluation and opinion of the consultative examiner, and (3) failing to discuss or assign weight to five of the six agency consultant opinions, particularly when one of those opinions suggested additional testing be conducted prior to reaching a decision as to disability. Consequently, the Court cannot find substantial evidence to support the decision of the ALJ.

B.     Assessment of Plaintiff's Credibility

The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were "only partially credible to the extent they were inconsistent with the record as a whole." R. 22. As discussed above, the record was not adequately developed by the ALJ. Accordingly, the Court cannot accept the ALJ's conclusion that Plaintiff's statements are not credible because they are inconsistent with the record. On remand, the ALJ's RFC determination must incorporate not only impairments supported by objective medical evidence, but also those impairments based on credible complaints made by the claimant. *Craig*, 76 F.3d at 594-96. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Craig*, 76 F.3d at 595-96.

C.     Vocational Expert Hypothetical

In reaching the decision that Plaintiff was capable of performing work available in

significant numbers in the national economy, the ALJ relied upon a VE's testimony in response to a hypothetical question. Plaintiff asserts the hypothetical presented to the vocational expert was incomplete as it did not contain the limitations discussed by Dr. Shea. Pl.'s Mem. 23.

To aid the ALJ in reaching a decision, the hypotheticals posed to a VE must account for all of the claimant's limitations as dictated by the record. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). If limitations are omitted from the hypothetical, the VE's testimony is of limited value, and may not constitute substantial evidence. *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2006) (citing *Walker*, 889 F.2d at 50). Failing to include limitations, and then relying on the deficient hypothetical to determine the availability of work suitable to the claimant is error. *Hancock v. Barnhart*, 206 F.Supp.2d 757, 767 (W.D.Va. 2002). On remand, after sufficiently developing the record and appropriately assigning weight to the opinions in the record, the ALJ's opinion should consider the VE's testimony in light of all of Plaintiff's impairments, or explain why the impairments omitted are not supported by the record.

## V.  RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment be GRANTED; the Commissioner's Cross Motion for Summary Judgment be DENIED; the final decision of the Commissioner be REVERSED and REMANDED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule

6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
June 19, 2013

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was forwarded to each of the

following:

Howard D. Olinsky, Esq.
Olinsky Law Group
300 South State Street
Suite 420
Syracuse, NY 13202

John E. Basilone, Esq.
Goss & Fentress
753 Newtown Road
Suite 100
Norfolk, VA 23502

Mark A. Exley, Esq.
United States Attorney Office
101 W Main St
Suite 8000
Norfolk, VA 23510
(757) 441-6331

Fernando Galindo, Clerk

By _____
Deputy Clerk
June **19**___, 2013